**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| JTH Tax LLC, | No. CV-23-00209-PHX-DJH |
| Plaintiff, | **ORDER** |
| v. | |
| Kyle Anderson, et al., | |
| Defendants. | |

Plaintiff JTH Tax LLC d/b/a Liberty Tax Service ("Liberty") applied for a Temporary Restraining Order ("TRO") against the following ten Defendants: Kyle Anderson ("Anderson"), RKA Tax LLC ("RKA Tax"),[1] Tolga Tax LLC d/b/a Bettertax.us ("Tolga Tax"), Tolga Kuru ("Kuru"), Kelly Tax LLC ("Kelly Tax"), Kelly Tamayo ("Tamayo"), KSFA LLC d/b/a Sarah's Tax ("KSFA"), Sarah Rhoades ("Rhoades"), R&B 3909 LLC d/b/a/ Mytaxzen.com ("R&B"), and Pacific Tax and Accounting LLC ("Pacific Tax"). Liberty seeks to enjoin both the Anderson Defendants and the non-contract Defendants from "offering tax preparation services and soliciting Liberty's customers within twenty-five (25) miles of the boundaries of Anderson and RKA Tax's [Anderson Defendants] former Liberty franchise territories." (Doc. 19 at 1–2). Liberty also filed a Stipulated Motion for Entry of TRO against the Anderson Defendants, which the Court will grant.[2] (Doc. 31). Because Liberty has stipulated to entry of a TRO against the

---

[1] The Court will refer to Kyle Anderson and RKA Tax LLC as the "Anderson Defendants;" the Court will refer to the remaining Defendants as the "non-contract Defendants."

[2] Except for section C because during the hearing the parties noted they would iron out the

Anderson Defendants, the Court will only consider Liberty's TRO request against the non-contract Defendants.

The Court held a hearing on February 15, 2023, and took the matter under advisement. The Court must now decide whether Liberty has shown (1) a likelihood of success on the merits; (2) irreparable harm if injunctive relief were denied; (3) the equities weigh in Liberty's favor; and (4) that the public interest weighs in favor of injunctive relief. The Court finds Liberty has not met its burden and will therefore deny Liberty's application for TRO against the non-contract Defendants.

**I.   Background**

Liberty's Complaint brings seven counts:

   i.   Count I is an equitable breach of contract claim against the Anderson Defendants. (Doc. 1 at ¶¶ 60–71).
   ii.  Count II is a monetary breach of contract claim against the Anderson Defendants. (*Id.* at ¶¶ 72–79).
   iii. Count III is a Defend Trade Secrets Act ("DTSA") claim against all Defendants. (*Id.* at ¶¶ 80–98).
   iv.  Count IV is a conversion claim against all Defendants. (*Id.* at ¶¶ 99–105).
   v.   Count V is an unjust enrichment claim against all Defendants. (*Id.* at ¶¶ 106–112).
   vi.  Count VI is a tortious interference claim against non-contracting Defendants. (*Id.* at ¶¶ 113–121).
   vii. Count VII is a Computer Fraud and Abuse Act claim against non-contracting Defendants. (*Id.* at ¶¶ 122–126).

Liberty seeks a TRO against all Defendants. The Anderson Defendants are former Liberty franchisees, who, under their Franchise Agreements,[3] agreed "to not directly or indirectly prepare or file income tax returns within 25 miles of their former Liberty territory

---

details, but nothing new has been filed with the Court.

[3] The Anderson Defendants appear to have signed three Franchise Agreements with Liberty. (Doc. 19 at 2).

- 2 -

for a period of two years following termination or expiration." (Doc. 19 at 6). The Anderson Defendants terminated their Franchise Agreements in or around November of 2022. (*Id.* at 7).

Under Section 9 of the Franchise Agreement, the Anderson Defendants agreed to the following actions upon termination of the Franchise Agreements: (1) "return Liberty's confidential Operations Manual; (2) deliver all customer lists, tax returns, files, and records to Liberty; (3) refrain from using or disclosing Liberty's Trade Secrets and Confidential Information; (4) transfer to Liberty all leases and telephone numbers; and (5) adhere to all post-termination non-competition and non-solicitation covenants." (Doc. 20 at ¶ 11).

Under Section 10 of the Franchise Agreements, the Anderson Defendants agreed to "not directly or indirectly prepare or file income tax returns within 25 miles of their former Liberty territory for a period of two years following termination or expiration. Anderson and RKA Tax also agreed in this section to not solicit any of their former Liberty clients for two years following termination or expiration of the Franchise Agreements." (Doc. 20-1 at 19–20).

Liberty argues the Anderson Defendants are operating businesses with the non-contract Defendants at either the same locations as the Anderson Defendants former Liberty franchises or within the non-compete territory. (*Id.* at 8). Liberty contends these acts violate the Anderson Defendants post-termination obligations under Sections 9 and 10 of the Franchise Agreements. (*Id.*) Liberty thus seeks a TRO to enjoin the non-contract Defendants from operating their tax preparation businesses. (*Id.*)

The Court will consider whether Liberty has met its burden to obtain a TRO against the non-contract Defendants.

## II. Temporary Restraining Order

The standards governing temporary restraining orders and preliminary injunctions are "substantially identical." *Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) (citation omitted). Preliminary injunctive relief is an "extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To

obtain a preliminary injunction, a plaintiff must show: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm if injunctive relief were denied, (3) that the equities weigh in the plaintiff's favor, and (4) that the public interest favors injunctive relief. *Id.* at 20. The movant carries the burden of proof on each element of the test. *See Los Angeles Memorial Coliseum Comm'n v. National Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980).

The Ninth Circuit employs a "sliding scale" approach to preliminary injunctions, under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). The issuance of a preliminary injunction may be appropriate when there are "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff . . . so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135. "[C]ourts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief,'" and should be particularly mindful, in exercising their sound discretion, of the "public consequences in employing the extraordinary remedy of injunction." *Id.* at 24 (citations omitted).

**III. Discussion**

Before turning to the *Winter* factors, the Court must first determine whether the Franchise Agreements apply to the non-contract Defendants. At the hearing, Liberty argued the non-contract Defendants are acting in concert with the Anderson Defendants and thus bound by the Franchise Agreements under Rule 65(d)(2) of the Federal Rules of Civil Procedure. Rule 65(d)(2) states the scope of a TRO binds the parties and "other persons who are in active concert or participation" with the parties. Fed. R. Civ. P 65(d)(2)(c). The non-contract Defendants deny any knowledge of the Franchise Agreements or its provisions and thus argue they cannot be acting in concert with the Anderson Defendants. (*See* Docs. 30-1 at ¶ 4; 30-2 at ¶ 3; 30-3 at ¶ 6). At this juncture,

the Court finds there is insufficient evidence to show the non-contract Defendants had knowledge of the Franchise Agreements and so cannot conclude that the non-contract Defendants are acting "in active concert or participation" with the Anderson Defendants. The Court therefore finds the non-contract Defendants are not bound by the Franchise Agreements between Liberty and the Anderson Defendants.

### A. Non-contract Defendants

The Court applies Arizona law because the choice of law provision in the Franchise Agreements are between Liberty and the Anderson Defendants, and thus are inapplicable to the non-contract Defendants. (Doc. 20-1 at 25). Liberty's TRO seeks to enjoin the non-contract Defendants from the following actions:

> [1] offering tax preparation services and soliciting Liberty's customers within twenty-five (25) miles of the boundaries of [the Anderson Defendant's] former Liberty franchise territories for two years following the entry of any injunction;
>
> [2] accessing or using the Liberty System, Liberty Property or Liberty Proprietary Information (as defined in Confidentiality Agreement);
>
> [3] [using] Liberty's Confidential Information and Trade Secrets, and [returning] all Confidential Information of Liberty's that is in their possession or control; and
>
> [4] transfer[ing] the leases and telephone numbers associated with their former Liberty franchises to Liberty.

(Doc. 19 at 2).

The Court will deny Liberty's TRO request against the non-contract Defendants because the *Winter* factors do not presently weigh in Liberty's favor.

### 1. Likelihood of Success on the Merits

To prevail on the first *Winter* factor, Liberty must show a likelihood of success on the merits. *Winter*, 555 U.S. at 20. Liberty brings the following claims against the non-contract Defendants: (1) a Defend Trade Secrets Act ("DTSA") claim; (2) a conversion claim; (3) an unjust enrichment claim; (4) a tortious interference claim; and (5) a Computer Fraud and Abuse Act claim. (Doc. 1 at ¶¶ 80–126).

### a. Defend Trade Secrets Act

"An owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). To state a claim under the DTSA, a plaintiff must allege: "(1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657–58 (9th Cir. 2020). A trade secret is defined as "financial, business, scientific, technical, economic, or engineering information" that the owner takes reasonable measures to keep secret and the information derives independent economic value from being a secret. 18 U.S.C. § 1839(3).

Liberty alleges its trade secrets include "its confidential Operations Manual and Confidential Information such as client tax returns, customer financial records and information, training manuals, marketing strategies, and customer lists, that are related to Liberty's national income tax preparation services used in interstate commerce." (Doc. 1 at ¶ 82). The Court finds this allegation sufficient to state Liberty possessed a trade secret.

Liberty alleges the non-contract Defendants misappropriated the trade secrets "for their own economic benefit and with the intention and knowledge and that their conduct would injury Liberty." (*Id.* at ¶ 95). Liberty argues the non-contract Defendants used Liberty's operations manual to secure a pecuniary benefit for their new competing businesses. (Doc. 19 at 17). But as the non-contract Defendants point out, the allegations do not provide specifics as to their conduct. Liberty's Complaint does not specify which non-contract Defendants misappropriated what information. Nor does the Complaint reveal when the confidential information was misappropriated. The Court therefore finds these allegations insufficient to state the non-contract Defendants misappropriated trade secrets and caused damage to Liberty's reputation. Liberty has therefore not met its burden in showing a likelihood of success on the merits of its DTSA claim.

**b. Conversion Claim**

Arizona law defines conversion as "an act of wrongful dominion or control over

personal property in denial of or inconsistent with the rights of another." *Case Corp. v. Gehrke*, 91 P.3d 362 (Az. Ct. App. 2004) (quoting *Sears Consumer Fin. Corp. v. Thunderbird Prods.*, 802 P.2d 1032 (Az. Ct. App. 1990)). For a plaintiff to prevail on a conversion claim, they "must have had the right to immediate possession of the personal property at the time of the alleged conversion." *Id.*

Liberty alleges that Section 9 of the Franchise Agreement required the non-contract Defendants to return "(a) any copies, including electronic copies and media, of lists and other sources of information containing the names, addresses, e-mail addresses, or phone numbers of customers who patronized the franchised business; (b) any copies, including electronic copies and media, containing, customer tax returns, files, and records; and (c) the copy of the Operations Manual and any updates (collectively, the "[p]roperty")." (Doc. 19 at 28). Liberty argues the non-contract Defendants continue to use the property and have exercised dominion over the property for their own financial gain. (*Id.*) However, the non-contract Defendants are not bound by the Franchise Agreement. The Court therefore finds Liberty has failed to meet its burden in showing a likelihood of success on the merits of its conversion claim.

### c. Unjust Enrichment Claim

To prevail on an unjust enrichment claim, a plaintiff must allege: "(1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the impoverishment; (4) absence of justification for the enrichment and the impoverishment; and (5) an absence of a remedy provided by law." *Perez v. First Am. Title Ins. Co.*, 810 F. Supp. 2d 986, 991 (D. Ariz. 2011) (quoting *Freeman v. Sorchych*, 245 P.3d 927 (Az. Ct. App. 2011)).

Liberty argues it "conferred a substantial benefit" by allowing the non-contracting Defendants to use Liberty's proprietary franchise system and confidential information to obtain customers within the territory. (Doc. 19 at 19). Liberty says the non-contract Defendants did not comply with the Franchise Agreements because they retained "the information for their own competing business designed to take Liberty's customers without

paying the value owned pursuant to the Franchise Agreements." (*Id.*) But again, because the non-contract Defendants are not bound by the Franchise Agreement, the Court finds Liberty has failed to meet its burden in showing a likelihood of success on the merits of its unjust enrichment claim.

### d. Tortious Interference Claim

For this claim, a plaintiff must allege: "(1) the existence of a valid contractual relationship or business expectancy, (2) the interferer's knowledge of the relationship or expectancy, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *FLP, LLC v. Wolf*, 2017 WL 4699490, at *2 (D. Ariz. Oct. 19, 2017).

Liberty argues the non-contract Defendants are "interfering with Liberty's existing customer relationships." (Doc. 19 at 18–19). Liberty says the non-contract Defendants opened "their own competing tax services in the same territory and location to usurp Liberty's goodwill and franchise system to compete and solicit Liberty's former customers." (*Id.*) Liberty contends the evidence shows the non-contract Defendants "were operating several tax preparation businesses within the non-compete territory and utilizing the same phone numbers as the Liberty locations." (*Id.*) Liberty argues this violates the Franchise Agreement. (*Id.*) But in each of the non-contract Defendants declarations, they state they had no knowledge of the Franchise Agreements between Liberty and the Anderson Defendants and did not know the agreements existed until this lawsuit. (*See* Docs. 30-1 at ¶ 4; 30-2 at ¶ 3; 30-3 at ¶ 6). Liberty's Complaint offers no evidence that the non-contract Defendants knew of the Franchise Agreements between Liberty and the Anderson Defendants. Liberty speculates that these parties have had longstanding business relationships and thus the non-contract Defendants must have known about the Franchise Agreements. But this argument is insufficient to show that they had knowledge of the Franchise Agreements themselves. The Court therefore finds Liberty has failed to meet its burden in showing a likelihood of success on the merits of its tortious interference claim.

### e. Computer Fraud and Abuse Act Claim

The Computer Fraud and Abuse Act ("CFAA") provides a civil cause of action for the unauthorized accessing of a protected computer with the intent to obtain valuable information. 18 U.S.C. § 1030. To bring an action under 18 U.S.C. § 1030(g) based on a violation of 18 U.S.C. § 1030(a)(2), a plaintiff must allege: (1) "intentionally accessed a computer, (2) without authorization or exceeding authorized access, and that he (3) thereby obtained information (4) from any protected computer (if the conduct involved an interstate or foreign communication), and that (5) there was loss to one or more persons during any one-year period aggregating at least $5,000 in value." *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1132 (9th Cir. 2009).

Liberty alleges the non-contract Defendants "intentionally accessed a computer used in connection with [the Anderson Defendants] Liberty office(s)." (Doc. 1 at ¶ 123). Liberty alleges the non-contract Defendants lacked authority to access the computers, obtained data from the computer, and obtained confidential information from that computer in violation of the CFAA, and have caused Liberty to suffer a loss in excess of $5,000 in a one-year period. (*Id.* at ¶ 124–126).

Here again, Liberty fails to provide specifics as to each of the non-contract Defendants' conduct. Liberty does not specify which non-contract Defendants accessed the computer, what information was obtained, or at what locations these alleged actions occurred. The Court therefore finds Liberty has failed to meet its burden in showing a likelihood of success on the merits of its CFAA claim.

### 2. Likelihood of Irreparable Harm

Under the second *Winter* factor, a plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. Irreparable harm is harm "that cannot be redressed by a legal or equitable remedy following trial." *Premier Nutrition, Inc. v. Organic Food Bar, Inc.*, 475 F. Supp. 2d 995, 1007 (C.D. Cal. 2007) (internal quotation marks omitted).

Liberty argues the absence of a TRO would result in irreparable harm to Liberty's

"goodwill, reputation, and relationships with customers in the territory covered by the Franchise Agreements non-compete provisions." (Doc. 19 at 9). "Evidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm," but "[t]hose seeking injunctive relief must proffer *evidence* sufficient to establish a *likelihood* of irreparable harm." *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250–51 (9th Cir. 2013) (emphasis added) (holding that platitudes about goodwill and reputation, not grounded in evidence, are insufficient to establish a likelihood of irreparable injury).

Here, Liberty has failed to establish such a likelihood because their evidence is speculative. Liberty claims the non-contract Defendants' business operations has harmed its reputation and caused it to lose customers. To support this assertion, Liberty notes Tolga Tax filed no tax returns in 2020 or 2021, but then filed 1,212 tax returns in 2022. (Doc. 19 at 3). By comparison, the Anderson Defendants filed 2,113 tax returns in 2021, which decreased to 1,139 tax returns filed in 2022. (*Id.*) Liberty contends the Anderson Defendants' decrease in tax returns "closely corresponds" to increase of tax returns filed by Tolga Tax in 2022.[4] (*Id.*) Liberty suggests the Anderson Defendants decrease in tax returns shows Liberty's former customers are now filing their tax returns at Tolga Tax. While the numbers bear some resemblance, Liberty offers no further evidentiary support to show the increase of tax returns filed by Tolga Tax and the subsequent decrease of tax returns filed by the Anderson Defendants includes former Liberty customers.

Nor does Liberty set forth evidentiary support for their assertion that the non-contract Defendants have been offering tax preparation services using Liberty's name. Liberty points to a statute of the liberty logo at Defendant Rhoades location, but Ms. Rhoades confirmed this sign has been sanded down. (Doc. 30-1 at ¶ 5). Although Defendant Rhoades and Defendant Kuru were previous office managers for the Anderson Defendants Liberty franchise locations, the Court finds this evidence is insufficient to show a potential loss of a customer base. In sum, at this juncture, the Court finds that Liberty's

---

[4] Liberty does not provide tax return numbers as to the other non-contract Defendants.

alleged harm is speculative. Liberty has therefore failed to establish a likelihood of irreparable harm.

### 3. Balance of Equities

"The basic function of a preliminary injunction is to preserve the status quo pending a determination of the action on the merits." *Chalk v. United States Dist. Court Cent. Dist.*, 840 F.2d 701, 704 (9th Cir. 1988). "Status quo is defined as the last, uncontested status which preceded the pending controversy." *Susanville Indian Rancheria v. Leavitt*, 2007 U.S. Dist. LEXIS 18702, at *21 (E.D. Cal. Feb. 28, 2007) (quoting *Regents of the Univ. of Cal.*, 747 F.2d 511, 514 (9th Cir 1984).

Liberty argues the balance of equities tip in their favor because the non-contract Defendants "freely agreed to the terms of the Franchise Agreements and reaped the benefits of their association with [Liberty] for several years." (Doc. 19 at 21). They contend the relief request is narrow and any costs the non-contract Defendants may incur in adhering to the Franchise Agreements pale in comparison to the irreparable injury to the goodwill and reputation Liberty has suffered and will continue to suffer. (*Id.*) On the other hand, the non-contract Defendants argue that no contract exists between them and Liberty and thus Liberty is not entitled to a shutdown. (Doc. 30 at 12). The non-contract Defendants further argue a TRO would destroy their small businesses and have a devastating effect on their employees and communities they serve. (*Id.*)

The non-contract Defendants have the stronger argument because they are not parties to the Franchise Agreements. The TRO sought here does not aim to preserve the status quo, but instead alters the status of the non-contract Defendants. The TRO would require the non-contract Defendants to cease all business operations. Liberty relies on an out of circuit district court case to support their argument that courts have found the balance of harm favors Liberty in relation to their non-compete and non-solicitation covenants in actions against former franchisees. *See JTH Tax, Inc. v. Lee*, 514 F. Supp. 2d 818, 825 (E.D. Va. 2007). Not only is this case is not binding on this Court, but there the court considered the franchise agreement's enforcement against a party who had signed it. *Id.*

Here, the non-contract Defendants are not parties to the Franchise Agreement and so the non-compete and non-solicitation covenants do not apply. Apart from allegations of goodwill and reputational harm, Liberty has provided minimal evidence of harm. The balance of equities therefore favors the non-contract Defendants.

### 4. The Public Interest

Liberty argues the public interest favors a TRO because there is a public interest in enforcing restrictive covenants that protect legitimate business interests and help prevent consumer confusion. (Doc. 19 at 22). But this argument carries weight only if the non-contract Defendants are bound by the Franchise Agreements and if Liberty is likely to succeed on the merits, which they are not. On the other hand, the non-contract Defendants argue they are small businesses that earn almost all their money during tax season and shutting them down would devastate their families and the clients they serve. (Doc. 30 at 11). The Court agrees with Liberty that enforcing legitimate non-compete obligations serves the public interest in preventing consumer confusion. However, there is insufficient evidence to show the non-contract Defendants had knowledge of the Franchise Agreements and the restrictive covenants therein. Thus, the public interest favors the non-contract Defendants.

## III. Conclusion

At this juncture, Liberty has failed to meet its burden to demonstrate a likelihood of success on the merits of its claims. Liberty has also failed to offer evidence showing a likelihood of irreparable harm, and the balance of equities and the public interest weigh against enjoining the non-contract Defendants from operating their tax businesses under a Franchise Agreement to which they were not parties. Having considered all of the evidence and the arguments of the parties and having considered each of the *Winter* factors with respect to the claims for injunctive relief, the Court finds Liberty is not entitled to a TRO against the non-contract Defendants.

Accordingly,

**IT IS HEREBY ORDERED** that Liberty's Stipulated Motion for Entry of

Temporary Restraining Order against Kyle Anderson and RKA Tax LLC ("Anderson Defendants") (Doc. 31) is **granted**. A Temporary Restraining Order shall be entered against the Anderson Defendants, which shall remain in force and effect until resolution of Liberty's Motion for Preliminary Injunction:

    a. Enjoining the Anderson Defendants from accessing or using the Liberty System, Liberty Property, or Liberty Proprietary Information as defined in the Confidentiality Agreement;

    b. Enjoining the Anderson Defendants from using any of Liberty's trade secrets or confidential information for any reason including for the benefit of any business entity or individual;

    d. The Anderson Defendants do not admit or concede to the prior improper retention or use of Liberty's trade secrets or confidential information prior to the execution of this stipulated order.

**IT IS FURTHER ORDERED** that Liberty's Motion for Temporary Restraining Order against the non-contract Defendants (Doc. 19) is **denied**.

**IT IS FINALLY ORDERED** that a hearing on Liberty's Motion for Preliminary Injunction is set for **April 19, 2023, at 1:00 p.m.** in Courtroom 605, 401 W. Washington St., Phoenix, Arizona 85003. The parties shall exchange marked copies of witness lists and exhibits to be used at the hearing no later than April 14, 2023. The parties shall also deliver an original and two copies of their witness list and exhibit list with exhibits to Judge Humetewa's Courtroom Deputy Clerk by April 14, 2023. The parties shall otherwise complete witness lists and number and mark exhibits in accordance with the instructions found in Exhibit Marking Instructions at www.azd.uscourts.gov under Judges' Information; Orders, Forms and Procedures; and Standard Forms Used by All Phoenix Judges. Any witness not disclosed or exhibit not marked and exchanged by April 14, 2023, will be precluded at the hearing. The parties shall eliminate any duplicate witnesses or exhibits.

Dated this 17th day of February, 2023.

Honorable Diane J. Humetewa
United States District Judge